[Cite as *State v. Blanton*, 2023-Ohio-89.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29451 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 01381 |
| | : | |
| GREGORY E. BLANTON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 13, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

DAVID R. MILES, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Gregory E. Blanton, appeals from his convictions in the Montgomery County Court of Common Pleas of purposeful murder, with a firearm specification, and endangering children. A jury had found him guilty of purposeful murder, felony murder, felonious assault, endangering children, and five firearm

specifications, but some of the offenses were merged. In support of his appeal, Blanton contends that the trial court erred by failing to include a jury instruction on involuntary manslaughter as a lesser included offense of purposeful murder and felony murder. Blanton also contends that the trial court erred by adding certain language to the standard jury instruction on the affirmative defense of blackout. Blanton further contends that all of his convictions were against the manifest weight of the evidence and that his trial counsel provided ineffective assistance in various respects. For the reasons outlined below, we disagree with Blanton's arguments and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On May 20, 2020, a Montgomery County grand jury returned an indictment charging Blanton with one count of purposeful murder in violation of R.C. 2903.02(A), two counts of felony murder in violation of R.C. 2903.02(B), one count of felonious assault in violation of R.C. 2903.11(A)(1) (serious physical harm), one count of felonious assault in violation of R.C. 2903.11(A)(2) (deadly weapon), and one misdemeanor count of endangering children in violation of R.C. 2919.22(A). The counts for murder, felony murder, and felonious assault each included a three-year firearm specification under R.C. 2929.14 and R.C. 2941.145. All the charges stemmed from the shooting death of Blanton's paramour, K.C.

{¶ 3} Blanton pled not guilty to all the charges and specifications in the indictment, and the matter proceeded to a jury trial. At trial, the State presented testimony from several witnesses including K.C.'s neighbors and friends, the officers who investigated

the shooting, the children services caseworker who was assigned to work with K.C. and Blanton's son, the cellular analyst who traced Blanton's cell phone to the scene of the shooting, and the coroner who examined K.C.'s body.   In his defense, Blanton presented expert testimony from a licensed psychologist and also testified on his own behalf.   The following is a summary of the testimony and evidence that was presented at trial.

*Blanton and K.C.'s Relationship*

{¶ 4} Blanton began having an extramarital affair with K.C. several years prior to K.C.'s death.   Although Blanton reconciled with his wife, he continued to engage in sexual activity with K.C.   Blanton and K.C.'s relationship resulted in K.C.'s giving birth to a son in 2015.   After the birth of their son, Blanton and K.C. had problems negotiating visitation.

*Joy Young and Deveney Starks*

{¶ 5} On the morning of May 9, 2020, K.C. was on her cell phone using the Facetime application to do a group video chat with two of her friends and coworkers, Joy Young and Deveney Starks.   Young and Starks testified that as they were chatting with K.C., K.C. and her four-year-old son were getting into K.C.'s vehicle to go run some errands.   Young and Starks testified that once K.C. was inside her vehicle, she looked in her rearview mirror and said in an upset tone: "What is he doing here?" and "I told him about popping up at my house."   Trial Tr., Vol. III, p. 345-346 and 362.

{¶ 6} Young and Starks thereafter saw K.C. get out of her vehicle and walk out of

her garage and into her driveway. Young and Starks testified that as K.C. was walking to her driveway, she told them that she was going to mute the call. After K.C. muted the call, Starks continued looking at her cell phone screen to try and figure out what was going on. Starks testified that she saw K.C. approach someone and say some words that she could not hear because the call was muted. Starks and Young testified that K.C.'s cell phone then froze while showing an image of the sky and then later went black. Later that day, Starks and Young learned that K.C. had been shot and killed in her driveway.

*Jesse Smith*

{¶ 7} Jesse Smith, a neighbor who was temporarily living with his in-laws in a house directly across the street from K.C.'s house, testified that on the morning of May 9, 2020, he was standing in his living room with his youngest daughter watching the morning news when he looked out the window and saw K.C. and a man standing in her driveway arguing. Smith testified that he recognized the man as the father of K.C.'s child, who was later identified as Blanton. Believing that the argument was none of his business, Smith turned back to watch the news. Shortly thereafter, Smith heard five or six quick gunshots. After hearing those gunshots, Smith looked back out the window and saw Blanton holding a handgun and standing over K.C., who was lying face down on the ground. Smith testified that he then saw Blanton fire five or six more shots in rapid succession while aiming his firearm at the upper half of K.C.'s body.

{¶ 8} Continuing, Smith testified that he saw Blanton leave the scene in a hurry in

his black Chevy Impala. Smith ran outside to get Blanton's license plate number and called 9-1-1 to report the incident. Smith testified that when he ran across the street to K.C.'s driveway, he saw a child yelling and crying hysterically while standing a few feet away from K.C.'s body. Smith also testified that he was interviewed by detectives and that he identified Blanton as the shooter in a photospread presented to him on May 11, 2020.

*Rennes Bowers*

{¶ 9} Smith's fellow neighbor, Rennes Bowers, also rushed to the scene of the shooting. Bowers testified that on the morning in question he was standing in his kitchen with his wife when he heard five rapid-fire gunshots. Upon hearing the gunshots, Bowers ran outside and saw K.C. lying in the driveway and her son standing in the front yard crying. Bowers testified that K.C.'s son ran into his arms very upset. Bowers testified that K.C.'s son was screaming and crying and said: "Why did daddy kill mommy?" and "Why did daddy shoot mommy?" Trial Tr., Vol. IV, p. 412. During this time, Bowers testified that he saw a black vehicle drive off at a high rate of speed. Bowers had his wife called 9-1-1 while he went to check if K.C. was alive. Bowers testified, however, that there were no signs of life, as K.C. had been shot in the head several times.

*Denise Chestnut*

{¶ 10} Another neighbor, Denise Chestnut, testified that on the morning in question she heard rapid-fire gunshots and something that sounded like a wounded animal.

Chestnut thereafter heard a child make a distressed scream. Upon hearing this, Chestnut ran outside her front door and saw Bowers running down the street with his wife behind him. Chestnut testified that she then saw K.C. lying on the ground and that Bowers instructed her to call 9-1-1. Chestnut testified that Bowers had K.C.'s son with him and that she took the boy from Bowers and shielded him from looking at his mother's body. Chestnut then took K.C.'s son to her house to get him away from the scene. Chestnut testified that K.C.'s son was in a distressed state and kept repeated multiple times: "My Dad shot my Mom, and my Mom[ is] dead." Trial Tr., Vol. IV, p. 438-439.

### Officer Melissa Boyes

{¶ 11} Officer Melissa Boyes of the Dayton Police Department testified that she was the first officer at the scene of the shooting. Officer Boyes testified that when she arrived, she observed a deceased female lying face down in the driveway with blood coming out of her head. Officer Boyes also observed a cell phone located near the victim with voices talking on it. In addition, Boyes observed more than five shell casings lying around the victim, but no weapons. Boyes testified that she was able to determine that Blanton was the registered owner of the black Chevy Impala that had fled the scene using a partial license plate number that was provided by one of the neighbors.

### Officer Craig Stiver

{¶ 12} Officer Craig Stiver of the Dayton Police Department, an evidence technician who collected evidence and took photographs of the crime scene, testified that

he collected 11 nine-millimeter shell casings, which indicated that 11 bullets had been fired. The parties stipulated that all 11 casings were fired from the same weapon.

*Jamie Fricke*

{¶ 13} Jamie Fricke, a former employee of Montgomery County Children Services, testified that Blanton gave consent for his son to be placed in therapy following K.C.'s death. Fricke testified that while she spoke with Blanton, Blanton acknowledged that the shooting incident had occurred and that his son might have heard the shooting. Fricke testified, however, that Blanton was unsure whether his son saw the shooting.

*Agent Lance Kepple*

{¶ 14} Lance Kepple, a special agent with the FBI, testified that he is part of a group of specially trained agents who know how to interpret cell phone records and determine communication patterns and geolocation. Agent Kepple testified that he was asked by the Dayton Police Department to perform a cellular analysis on Blanton's cell phone. Agent Kepple testified that, based on the call detail records from Blanton's cell phone, he was able to determine that Blanton's cell phone was in the area of K.C.'s residence at the time of the shooting.

*Detective Zachary Williams*

{¶ 15} Detective Zachary Williams of the Dayton Police Department, the lead detective for K.C.'s homicide investigation, testified that on the evening after the shooting,

Blanton turned himself into law enforcement. Detective Williams testified that he processed Blanton for arrest and had him booked into jail. In doing so, Detective Williams testified that he took three photographs of Blanton's head; while taking those photographs, Williams did not observe any physical injuries on Blanton, and Blanton did not complain of any physical injuries. Detective Williams further testified that neither Blanton's vehicle nor the firearm used in the shooting was ever recovered. Detective Williams also confirmed that there were no other suspects in the shooting.

*Dr. Susan Brown*

{¶ 16} Forensic pathologist Susan Brown testified that she performed an autopsy on K.C.'s body. Dr. Brown testified that K.C. had five distinct gunshot wounds to her head and multiple abrasions on her forehead, nose, and upper lip. Dr. Brown also testified that there were no gunshot wounds to K.C.'s lower extremities and that K.C.'s cause of death was homicide by multiple gunshot wounds to the head.

*Gregory Blanton*

{¶ 17} Blanton testified that on the morning in question he went to pick up his son from K.C. because he had planned on celebrating his birthday that day and having family pictures taken. Blanton testified that when he arrived at K.C.'s residence, he put his son in his vehicle and they drove away. However, Blanton testified that he forgot his son's toy dinosaurs, so they went back to K.C.'s house to pick up the dinosaurs and to get his son's toothbrush. Blanton testified that when he returned to K.C.'s residence, he and

K.C. began to argue about a bag of clothes that K.C. wanted Blanton to take with him for their son; his son got out of his car as they were arguing. Blanton testified that when he turned around to pick up his son, K.C. punched him in the mouth and in the back of his head. Blanton then claimed that he blacked out and did not remember anything until he "came to" and saw K.C. lying on the ground. Trial Tr., Vol. V, p. 652.

{¶ 18} Blanton testified that he regularly carried a handgun on his person even though his gun permit had expired. Blanton also testified that he had his handgun with him on the morning of the shooting and admitted that his handgun was in his hand when he awoke from his blackout. Blanton stated that when the blackout was over, he did not know what had happened and he did not see his son anywhere. Blanton testified that he panicked, got into his vehicle, and left the scene. Blanton also confirmed that he eventually turned himself in to law enforcement.

*Dr. Barbara Bergman*

{¶ 19} Dr. Barbara Bergman, a licensed psychologist, testified that, at Blanton's request, she had been appointed by the trial court to perform a second-opinion evaluation on his mental condition. During her testimony, Dr. Bergman provided Blanton's mental health background and testified that, as a child, Blanton had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and had been severely behaviorally handicapped due to explosiveness and aggression. Dr. Bergman testified that Blanton had been sexually abused as a child and had witnessed domestic violence in his home. Dr. Bergman further testified that Blanton suffered from post-traumatic stress disorder

("PTSD") and intermittent explosive disorder.

{¶ 20} Continuing, Dr. Bergman testified that Blanton told her that K.C. had hit him on the head and that he "went black" and did not remember the details of when he fired his weapon. Trial Tr., Vol. V, p. 624. Dr. Bergman testified that getting hit in the head would not have caused Blanton to blackout unless he had traumatic brain injury. Dr. Bergman also testified that blackouts are not a symptom of PTSD and that, when Blanton described what had happened during his blackout, he described the psychological symptoms of "intermittent explosive disorder." Trial Tr., Vol. V, p. 628. Accordingly, in her expert opinion, Dr. Bergman testified that Blanton had not suffered from a blackout when he shot and killed K.C., but from intermittent explosive disorder. *Id.*

*Jury Instructions*

{¶ 21} After both parties rested, Blanton requested a jury instruction on involuntary manslaughter as a lesser included offense of purposeful murder and felony murder and an instruction on the affirmative defense of blackout. The trial court denied Blanton's request for a jury instruction on involuntary manslaughter, but granted his request for an instruction on the defense of blackout. The trial court, however, indicated that in addition to giving the standard blackout instruction, it was going to add the following language from *State v. Cutlip*, 11th Dist. Lake No. 99-L-149, 2001 WL 687493, (June 15, 2001): "The evidence must establish that the Defendant was unconscious and acted involuntarily. A defendant's mere failure to remember what happened does not constitute such evidence." Blanton objected to the additional language, and the trial

court overruled the objection.

*Verdict and Sentence*

{¶ 22} After deliberations, the jury found Blanton guilty as charged in the indictment. At sentencing, the trial court merged the counts for purposeful murder, felony murder, and felonious assault and their attendant firearm specifications. The State then elected to have Blanton sentenced for purposeful murder. Thereafter, the trial court imposed a mandatory term of 15 years to life in prison for purposeful murder and a consecutive three-year prison term for the attendant firearm specification to be served prior to the 15-year-to-life term. The trial court also imposed 180 days of local incarceration for endangering children and ordered that sentence to be served concurrently to the murder sentence. Accordingly, Blanton received a total, aggregate sentence of 18 mandatory years to life in prison.

{¶ 23} Blanton now appeals from his convictions, raising four assignments of error for review.

**First Assignment of Error**

{¶ 24} Under his first assignment of error, Blanton contends that the trial court erred by failing to give a jury instruction on involuntary manslaughter as a lesser included offense of purposeful murder and felony murder. We disagree.

{¶ 25} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and

necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.2d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "A defendant is only entitled to have his proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge." *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 23, citing *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981). "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." (Citation omitted.) *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65. A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 26} "Crim.R. 31(C) and R.C. 2945.74 provide that a jury may find a defendant not guilty of the offense charged but guilty of a lesser included offense." *State v. Hanners*, 2d Dist. Montgomery No. 29375, 2022-Ohio-4114, ¶ 25. Therefore, "[a] criminal defendant is sometimes entitled to a jury instruction that allows the jury to consider convicting the defendant of a lesser included offense as an alternative to convicting for the offense for which the defendant was charged." *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, 166 N.E.3d 1142, ¶ 8, citing *State v. Thomas*, 40 Ohio St.3d 213, 216-218, 533 N.E.2d 286 (1988). " 'An offense may be a lesser included

offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot be committed without the offense of the lesser degree also being committed and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.' " *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 7, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 384, 415 N.E.2d 303 (1980*). Accord State v. Stanaford*, 2d Dist. Montgomery No. 27940, 2019-Ohio-1377, ¶ 59.

**{¶ 27}** "In Ohio, courts employ a two-part test to determine whether a jury instruction on a lesser included offense is necessary." *State v. Lambert*, 2d Dist. Montgomery No. 28655, 2021-Ohio-17, ¶ 41, citing *State v. Kidder*, 32 Ohio St.3d 279, 280-281, 513 N.E.2d 311 (1987). "First, the trial court must determine whether the offense on which the instruction is requested is a lesser included offense of the crime charged." *Id.*, citing *Kidder* at 280. "Second, the trial court must determine whether the evidence adduced at trial would support an instruction on the lesser included offense." *Id.*, citing *Kidder* at 281. In doing so, "[t]he evidence must be considered in the light most favorable to the defendant." *Id.* at ¶ 48, citing *State v. Campbell*, 74 Ohio App.3d 352, 358, 598 N.E.2d 1244 (1st Dist.1991). "A court should give a charge on a lesser-included offense where the evidence presented at trial can reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense." *Id.*, citing *Thomas* at paragraph two of the syllabus.

**{¶ 28}** In this case, Blanton contends that the trial court abused its discretion by failing to give a jury instruction on involuntary manslaughter as a lesser included offense

of purposeful murder in violation of R.C. 2903.02(A) and felony murder in violation of R.C. 2903.02(B). "Involuntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or a misdemeanor." *Kidder* at 282; *Thomas* at 215; *State v. Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 39. Involuntary manslaughter is also a lesser-included offense of felony murder. *State v. Rider*, 2d Dist. Champaign No. 2021-CA-12, 2022-Ohio-1964; ¶ 41, citing *Thomas* at 215. *See also Lambert* at ¶ 47.

{¶ 29} R.C. 2903.04 defines involuntary manslaughter as causing "the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony" or "a misdemeanor of any degree." R.C. 2903.04(A) and (B). It is almost identically worded to the felony murder statute, R.C. 2903.02(B), which prohibits one from causing "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.02(B). "The primary difference between the felony-murder statute and the involuntary-manslaughter statute is that the former requires the underlying offense to be a first-degree or second-degree felony offense of violence, whereas the latter merely requires that the underlying offense be a felony or a misdemeanor." *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 20; *Lambert* at ¶ 49. Therefore, "[w]hile proof of felony murder * * * would always and necessarily prove involuntary manslaughter, * * * the converse is not true." *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002 WL 191582, *3 (Feb. 8, 2002).

{¶ 30} In this case, Blanton's two counts of felonious assault (deadly weapon and serious physical harm) were the only charges that could have warranted a conviction for involuntary manslaughter. While Blanton was also charged with one misdemeanor count of endangering children, the victim of that offense, Blanton's son, was not killed by Blanton. In other words, Blanton's commission of the endangering children offense did not proximately result in the death of another, as the death in this case was proximately caused by Blanton's felonious assault on K.C. Therefore, under the specific facts of this case, the endangering children offense could not have served as the offense underlying a conviction for involuntary manslaughter.

{¶ 31} Because felonious assault is a second-degree felony and an offense of violence, it can serve as the underlying offense to a conviction for felony murder. *See* R.C. 2903.11(D) and 2901.01(A)(9)(a). This court has explained that "if 'felonious assault is the underlying offense that causes the death of [a person], [then] felony murder is the proper charge,' and in such a case, a trial court does not err by refusing to charge a jury on involuntary manslaughter." *State v. Lynch*, 2d Dist. Montgomery No. 27620, 2018-Ohio-1424, ¶ 26, quoting *State v. Brundage*, 1st Dist. Hamilton No. C-030632, 2004-Ohio-6436, ¶ 12. *Accord Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, at ¶ 41.

{¶ 32} Because Blanton's two felonious assault counts were the only felonies underlying the victim's death, it was appropriate for the trial court to refuse a jury instruction on involuntary manslaughter; felony murder was the proper charge under the circumstances of this case. Also, instructing the jury on involuntary manslaughter as a

lesser included offense of purposeful murder would have had the effect of duplicating the felony murder charges brought against Blanton. *See Turner* at ¶ 41. For these reasons, the trial court did not abuse its discretion by failing to instruct the jury on involuntary manslaughter.

**{¶ 33}** We do, however, note that the trial court decided not to instruct the jury on involuntary manslaughter for a different, erroneous reason. Specifically, the trial court mistakenly applied a voluntary manslaughter analysis and found that an instruction on involuntary manslaughter was not warranted because there was no evidence establishing that Blanton shot the victim under the influence of sudden passion or sudden fit of rage that was brought on by serious provocation occasioned by the victim. Although the trial court's decision to reject an involuntary manslaughter jury instruction was based on erroneous reasoning, the trial court nevertheless reached the correct result, making the error harmless. S*ee State v. Rice,* 2d Dist. Montgomery No. 28572, 2020-Ohio-4404*,* ¶ 33, citing *State v. Hall*, 2d Dist. Miami No. 1997-CA-22, 1997 WL 691509, *1 (Oct. 24, 1997), citing *Newcomb v. Dredge*, 105 Ohio App. 417, 152 N.E.2d 801 (2d Dist.1957) ("If a trial court has stated an erroneous basis for its judgment, an appellate court will affirm the judgment if it is legally correct on other grounds, that is, when it achieves the right result for the wrong reasons.").

**{¶ 34}** Blanton's first assignment of error is overruled.

## Second Assignment of Error

**{¶ 35}** Under his second assignment of error, Blanton contends that the trial court

erred by adding certain language from *Cutlip*, 11th Dist. Lake No. 99-L-149, 2001 WL 687493, to the standard jury instruction on the affirmative defense of blackout. Specifically, Blanton takes issue with the following language in the trial court's jury instruction: "The evidence must establish that the Defendant was unconscious and acted involuntarily. A defendant's mere failure to remember what happened does not constitute such evidence." Court Exhibit II, Jury Instructions, p. 15.

{¶ 36} As previously discussed, a trial court's decision to give or exclude a particular jury instruction is reviewed for an abuse of discretion. *Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, at ¶ 65; *Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, at ¶ 22. Although a trial court "has broad discretion to decide how to fashion jury instructions," such instructions must "present a correct, pertinent statement of the law that is appropriate to the facts" of the case. *White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 46, citing *Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640, at paragraph two of the syllabus, and *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. Whether a jury instruction correctly states the applicable law is reviewed de novo. *State v. Rac*, 2019-Ohio-893, 124 N.E.3d 878, ¶ 17 (2d Dist.).

{¶ 37} In his appellate brief, Blanton contends that the trial court erred by including the challenged language from *Cutlip* in its blackout defense jury instruction because he claims that *Cutlip* is outdated caselaw that is not controlling in this district. While it is true that this court is not bound to follow *Cutlip*, we find no issue in doing so, as *Cutlip* correctly states the law as it pertains to the blackout defense, which is a recognized affirmative defense in Ohio. *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285,

¶ 1.

{¶ 38} The blackout defense applies where a person commits an act while unconscious, as in a blackout, due to disease, injury, sleep, or heart failure. Ohio Jury Instructions, CR Section 417.07, paragraph one. Under those circumstances, such act is not a criminal offense even though it would be a crime if such act were the product of a person's will or volition. *Id.*

{¶ 39} In *Cutlip,* the defendant was tried and convicted for aggravated arson. *Cutlip*, 11th Dist. Lake No. 99-L-149, 2001 WL 687493, at *1. On appeal from his conviction, Cutlip argued that his trial counsel had provided ineffective assistance because counsel failed to request a jury instruction on the defense of blackout. *Id.* at *5. At trial, Cutlip testified that he did not remember setting the fire at issue and that he was an alcoholic who had experienced blackouts ever since he was a teenager. *Id.* at *4. One of the detectives who investigated the arson testified that Cutlip had informed him that he had consumed alcohol on the night of the fire and that he was prone to blackouts. *Id.* at *3. The defense also called a medical expert who testified that continuous drinking may cause blackouts in which a person looks awake and aware of what he is doing but does not remember anything that happened. *Id.* at *4.

{¶ 40} Based on the testimony presented at trial, the appellate court in *Cutlip* determined that a blackout jury instruction had not been warranted and that the defendant's trial counsel had not provided ineffective assistance by failing to request such an instruction. *Id.* at *7. The court reached this conclusion because the defendant's medical expert had not testified that the defendant was unconscious at any time, which

was necessary to support a blackout instruction. *Id.* The court also found that the defendant had simply testified that he could not remember what he did on the night in question and that a mere failure to remember what happened did not establish that the defendant had been unconscious and acted involuntarily for purposes of giving a blackout defense instruction. *Id.* In so holding, the court stated the following:

> The blackout defense is not available in every instance where the defendant cannot remember what occurred. Blackout or unconsciousness is a defense only where such condition is involuntary and such involuntary condition prevented the defendant from taking action that he or she is legally required to take under the circumstances or, possibly, in situations where the unconsciousness or blackout prevents a defendant from forming a specific intent. In the latter circumstance, the evidence must establish that the defendant was unconscious and acted involuntarily. A defendant's mere failure to remember what happened does not constitute such evidence.

*Id.*

{¶ 41} In reaching its decision, the court in *Cutlip* cited *State v. Griffin*, 10th Dist. Franklin No. 86AP-759, 1988 WL 4651 (Jan. 19, 1988), wherein the Tenth District Court of Appeals stated the following:

> [T]he defense of blackout is available only in those instances where the blackout prevented the defendant from acting in a normal fashion. This would include such a situation as operation of a motor vehicle, where

blackout would be a defense for losing control of the vehicle and causing injury or death to another. Here, however, the offense is not one that could be committed as a result of a blackout. No reflexes, convulsions, or other involuntary bodily movements by defendant could be involved in the conduct described by the witnesses consisting of stabbing the victim in the back and then in the throat.

In other words, the blackout defense is more than just loss of memory or failing to remember what occurred. Blackout or unconsciousness is a defense only where such condition prevented the defendant from taking action that he is legally required to take under the circumstances or, possibly also, in situations where the unconsciousness or blackout prevents a defendant from forming a specific intent with respect to an act which he voluntarily performs.

*Id.* at *2-3.

**{¶ 42}** The foregoing principles from *Cutlip* and *Griffin* have been applied in recent cases such as *Turnbow v. Bagley*, N.D.Ohio No. 5:08CV725, 2009 WL 4730596 (Dec. 7, 2009), and *State v. Craig*, 11th Dist. Lake No. 2021-L-023, 2022-Ohio-2200, ¶ 25. Therefore, we disagree with Blanton's claim that *Cutlip* is outdated caselaw. We also find that it was appropriate for the trial court to include the challenged language from *Cutlip* given that it was a correct, pertinent statement of law that applied to the facts of this case.

**{¶ 43}** Blanton nevertheless argues that the language from *Cutlip* "gutted" his case

and prejudiced him because he specifically testified that he did not remember what had happened during the shooting. However, " '[i]f from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results.' " *State v. Eng*, 2d Dist. Montgomery No. 14015, 1994 WL 543277, *4 (Sept. 30, 1994), quoting *State v. Hardy*, 28 Ohio St.2d 89, 92, 276 N.E.2d 247 (1971). That is the case here.

**{¶ 44}** In this court's view, the trial court was generous in giving the blackout defense instruction at all, as the instruction does not appear to have been warranted from the testimony and evidence presented at trial. By adding the language from *Cutlip* in the blackout defense instruction, the trial court ensured that the jury understood that the blackout defense did not apply simply because a defendant did not remember what happened during the incident in question. Again, because the challenged language from *Cutlip* is a correct, pertinent statement of law that applied to the facts of this case, we do not find that the trial court erred by adding that language to the blackout defense jury instruction.

**{¶ 45}** Blanton's second assignment of error is overruled.

## Third Assignment of Error

**{¶ 46}** Under his third assignment of error, Blanton contends that his convictions were against the manifest weight of the evidence because he credibly testified to suffering from a blackout, which, as previously discussed, is a recognized affirmative defense in Ohio. *See Ireland*, 155 Ohio St.3d 287, 121 N.E. 285, 2018-Ohio-4494 at ¶ 1.

**{¶ 47}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citations omitted). *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8. "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 48}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 49}** In this case, Blanton claims the weight of the evidence established that the affirmative defense of blackout applied to all of his offenses and that his convictions

should therefore be reversed. As previously discussed, the affirmative defense of blackout applies when a person commits an act while unconscious, as in a blackout, due to disease, injury, sleep, or heart failure. Ohio Jury Instructions, CR Section 417.07, paragraph one. Under those circumstances, such act is not a criminal offense even though it would be a crime if such act were the product of a person's will or volition. *Id.* Therefore, "blackout or unconsciousness is a defense only where such condition is involuntary[.]" *Cutlip*, 11th Dist. Lake No. 99-L-149, 2001 WL 687493, at * 7. "[T]he blackout defense is more than just loss of memory or failing to remember what occurred." *Griffin*, 10th Dist. Franklin No. 86AP-759, 1988 WL 4651, at *3; *Cutlip* at *7.

**{¶ 50}** At trial, Blanton testified that he blacked out after K.C. punched him in the mouth and on the back of his head. Blanton testified that when he eventually came to, he saw K.C. lying on the ground and did not remember anything that had happened during the blackout. Although Blanton admitted that his firearm was in his hand when he came to, he testified that he did not remember discharging his firearm.

**{¶ 51}** Blanton's medical expert, Dr. Bergman, however, testified that getting hit in the head would not have caused Blanton to blackout unless he had traumatic brain injury. Dr. Bergman also testified that blackouts were not a symptom of PTSD, with which Blanton had been diagnosed, and that when Blanton described his blackout to her, he described the psychological symptoms of intermittent explosive disorder. Therefore, in her expert opinion, Dr. Bergman testified that Blanton did not suffer from a blackout when he shot and killed K.C., but from intermittent explosive disorder. *Id.*

**{¶ 52}** In addition to Dr. Bergman's testimony, there was overwhelming evidence

indicating that Blanton did not blackout and act involuntarily when he shot K.C. Eyewitness Jesse Smith testified that after hearing an initial five or six gunshots, he looked outside his window and saw Blanton standing over K.C., who was lying face down on the ground. Smith then saw Blanton shoot K.C. five or six times in rapid succession while aiming his firearm directly at the upper half of K.C.'s body. The evidence also established that Blanton fired his weapon a total of 11 times during the incident and that K.C. suffered five gunshot wounds directly to her head and no wounds to her lower extremity. This evidence does not indicate that Blanton's conduct was the product of involuntary bodily movements as contemplated by the blackout defense.

{¶ 53} Based on the evidence and reasonable inferences, we do not find that the jury lost its way and created a manifest miscarriage of justice by rejecting Blanton's blackout defense. The only evidence supporting the blackout defense was Blanton's self-serving testimony that he had blacked out and did not remember what had happened at the time of the shooting. It was within the province of the jury to determine whether Blanton's testimony was credible, and the jury was "free to believe or disbelieve all or any of the testimony." *State v. Hawkins*, 2d Dist. Montgomery No. 27019, 2018-Ohio-867, ¶ 69, quoting *State v. Crosky*, 10th Dist. Franklin No. 06AP-655, 2008-Ohio-145, ¶ 78. Simply because the jury chose not to believe Blanton's testimony does not mean that the jury's decision was against the weight of the evidence. *See State v. Matzdorff*, 2d Dist. Montgomery No. 26370, 2015-Ohio-901, ¶ 18; *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, at *4. Accordingly, Blanton's claim that his convictions were against the manifest weight of the evidence lacks merit.

{¶ 54} Blanton's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 55} Under his fourth assignment of error, Blanton claims that he was denied a fair trial due to his trial counsel's providing ineffective assistance. In support of this argument, Blanton has asserted five ineffective assistance claims, which are addressed separately below.

*Standard of Review*

{¶ 56} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, Blanton must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 57} To establish deficient performance, Blanton must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 29, citing *Strickland*.

**{¶ 58}** To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

**{¶ 59}** In reviewing ineffective assistance claims, we will not second-guess trial strategy decisions*. State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998); *Strickland* at 689. Therefore, " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

*Claim 1: Insufficient Motion for Expert Assistance*

**{¶ 60}** On October 12, 2020, Blanton filed a pretrial "Motion for Expert Assistance of an Applied Behavioral Scientist" wherein Blanton requested that the trial court appoint

Dr. Mary Melton as an expert to interview and evaluate his mental condition at the State's expense. The trial court denied Blanton's request to have Dr. Melton appointed using public funding, but indicated that Blanton could privately retain Dr. Melton as an expert. The trial court reached this decision because it found that Blanton had failed to establish indigence for purposes of using public funding.

{¶ 61} For his first ineffective assistance claim, Blanton contends that his trial counsel's representation was deficient because counsel failed to establish his indigence for purposes of retaining Dr. Melton through public funding. In his appellate brief, Blanton suggests that his trial counsel's deficient performance in that regard prejudiced him because Dr. Melton could have provided expert testimony supporting his blackout defense. Blanton's claim fails for at least two reasons.

{¶ 62} First, there is nothing in the record establishing that Blanton was indigent. Although Blanton claims otherwise, he points to nothing in the record showing that he was indigent. Without some proof of indigence in the record, we cannot say that his trial counsel's failure to establish his indigence amounted to deficient performance for purposes of an ineffective assistance claim.

{¶ 63} Second, even if there had been something in the record indicating that Blanton was indigent, it is pure speculation to say that Dr. Melton or any other expert retained by public funding would have found that Blanton blacked out at the time of the shooting. "It is well established that mere speculation cannot support either the deficient performance or prejudice requirement of an ineffective-assistance claim." *State v. Morgan*, 2d Dist. Montgomery No. 27774, 2018-Ohio-3198, ¶ 16, citing *State v. Short*,

129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217. Here, Dr. Melton would have been the third expert to evaluate Blanton, and it is mere speculation to say that she would have reached a conclusion different from the other two experts, i.e., that Blanton was not legally insane at the time of the shooting and that he did not suffer from a blackout.

{¶ 64} For the foregoing reasons, Blanton's first ineffective assistance claim lacks merit.

*Claim 2: Delayed and Deficient Opening Statement*

{¶ 65} Blanton next claims that his trial counsel provided ineffective assistance by delaying his opening statement until after the State completed its case-in-chief. Blanton suggests that his counsel's decision to delay the opening statement prejudiced him because the jury heard the State's case without knowing his defense. We disagree.

{¶ 66} The decision to defer an opening statement is a tactical decision that will not ordinarily rise to the level of ineffective assistance of counsel. *See State v. Tibbetts*, 92 Ohio St.3d 146, 166-167, 749 N.E.2d 226 (2001). " 'Reserving an opening statement at the beginning of trial has the advantage of not disclosing the defense's trial strategy before the prosecution presents its case.' " *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 144, quoting *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 189.

{¶ 67} In *State v. Brown*, 2d Dist. Montgomery No. 14448, 1995 WL 491091 (Aug. 8, 1995), this court explained that:

Where a case against a criminal defendant is strong, as in the case before us, it may be sound strategy to wait to see if the State and its witnesses stumble at trial, and then pounce upon any infirmity in the State's proof. An opening statement that focuses upon matters that turn out at trial not to be subject to any weakness in the State's proof, or that promises proofs by the defense that cannot be delivered, may operate to a defendant's detriment. There is the further problem that the decision whether to call the defendant to testify is an important tactical decision that may not be made until the completion of the State's case. It may be difficult to structure an opening statement without knowing whether the defendant is going to be called to the stand to testify.

*Id.* at *4.

**{¶ 68}** In addition, we have no basis to conclude that the outcome of Blanton's trial would have been different if his trial counsel had provided an opening statement at the start of trial. *See State v. Lancaster*, 2018-Ohio-315, 104 N.E.3d 951, ¶ 60 (2d Dist.). Because delaying an opening statement is a matter of trial strategy, and because nothing in the record indicates that Blanton was prejudiced by the delay, we cannot say that trial counsel's decision to delay his opening statement supports an ineffective assistance claim.

**{¶ 69}** Blanton also argues that his trial counsel's opening statement was deficient because counsel told the jury that the defense was going to assert affirmative defenses, but did not tell the jury which ones. During his opening statement, Blanton's trial counsel

generally stated that: "Ohio law provides that citizens accused of certain crimes can assert affirmative defenses." Trial Tr., Vol. V, p. 588. Although Blanton's trial counsel thereafter failed to specifically state what affirmative defense he would be presenting, we fail to see how this prejudiced Blanton. This is because the record establishes that Blanton's trial counsel made it clear during closing argument that Blanton was asserting the affirmative defense of blackout. *Id.* at 737-738. The jury instructions provided by the trial court also advised the jury that Blanton was asserting the blackout defense. Court Exhibit II, Jury Instructions, p. 14-15. Because the jury was made aware of Blanton's blackout defense, we cannot say that any prejudice resulted from Blanton's trial counsel's failure to identify the defense during his opening statement.

**{¶ 70}** Lastly, Blanton claims that his trial counsel's opening statement was deficient because counsel conceded that Blanton had shot K.C. However, given the overwhelming evidence of Blanton's guilt, we find that Blanton's trial counsel made a rational decision to make this concession; counsel could not credibly argue that K.C. was not shot or that it was not Blanton who shot her. The concession allowed the defense to maintain credibility and focus the jury's attention on *why* Blanton shot the victim. *See State v. Whitaker*, Ohio Slip Opinion No. 2022-Ohio-2840, __ N.E.3d __, ¶ 71.

**{¶ 71}** During his opening statement, trial counsel discussed the fact that Blanton suffered from PTSD, intermittent explosive disorder, and blackouts. Then, at closing argument, Blanton's trial counsel tied that information to Blanton's military defense training and the "muscle memory" he developed with that training when arguing that Blanton involuntarily shot K.C. during a blackout. Under the circumstances of this case,

this defense strategy was reasonable. "[S]imply because there might have been ' "another and better strategy available' " does not mean that counsel provided ineffective assistance." *Id.*, quoting *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, 88 N.E.3d 935, ¶ 19, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶ 72} For the foregoing reasons, Blanton's second ineffective assistance claim lacks merit.

*Claim 3: Failure to Object to Hearsay*

{¶ 73} For his third ineffective assistance claim, Blanton contends that his trial counsel performed deficiently by failing to object to certain hearsay statements at trial. Specifically, Blanton takes issue with the fact that multiple witnesses were permitted to testify regarding statements they heard Blanton's son make regarding the shooting. For example, the victim's neighbor, Rennes Bowers, testified that Blanton's son ran into his arms very upset and screamed: "Why did daddy kill mommy?" and "Why did daddy shoot mommy?" Trial Tr., Vol. IV, p. 412. Another neighbor, Denise Chestnut, also testified that Blanton's son was in a distressed state and repeated multiple times: "My Dad shot my Mom, and my Mom[ is] dead." *Id.* at 438-439.

{¶ 74} Under the Ohio Rules of Evidence, hearsay evidence is not admissible except as otherwise provided by law or the rules of evidence. Evid.R. 802. Pursuant to Evid.R. 803(2), an "excited utterance" is an admissible form of hearsay. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R.

803(2). "For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event." *State v. Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 69, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166.

{¶ 75} Although Blanton's trial counsel did not raise an objection to the hearsay testimony, the matter was nevertheless discussed by the trial court. The trial court stated that "it is very clear that [Blanton's son] was under the influence of severe emotional distress" and concluded that his statements were "excited utterances" since "he was traumatized at the time." Trial Tr., Vol. V, p. 434.

{¶ 76} We agree that the hearsay statements of Blanton's son were admissible as excited utterances under Evid.R. 803(2). The statements met all the prerequisites of an excited utterance as it is clear from the record that the statements concerned the startling event of K.C.'s shooting and were made while Blanton's son was under severe emotional distress from witnessing the shooting. Accordingly, we do not find that Blanton's trial counsel performed deficiently by failing to object to the statements, as any such objection would have been overruled.

{¶ 77} Blanton also suggests that his trial counsel should have objected to the hearsay statements of Blanton's son on grounds that he was not competent to testify

since he was a young child. The Supreme Court of Ohio, however, has explained that "the inability to establish the competency of a child declarant does not affect the admissibility of the [child's] declarations for purposes of Evid.R. 803(2)." *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466 (1988). Therefore, whether Blanton's son was competent to testify was irrelevant to the admissibility of the excited utterances at issue. Accordingly, Blanton's trial counsel did not render deficient performance by failing to object to the hearsay statements on competency grounds.

{¶ 78} For the foregoing reasons, Blanton's third ineffective assistance claim lacks merit.

### Claim 4: Calling Dr. Bergman as an Expert Witness

{¶ 79} For his fourth ineffective assistance claim, Blanton contends that his trial counsel's representation was deficient because counsel called Dr. Bergman to testify at his trial. Blanton claims that having Dr. Bergman testify prejudiced him because she opined that he had not blacked out when he shot K.C.

{¶ 80} "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." (Citation omitted.) *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001); *State v. Brown*, 2d Dist. Miami No. 2002-CA-23, 2003-Ohio-2959, ¶ 9 ("whether or not to call an expert witness is a matter of trial strategy"). As previously discussed, "[d]ebatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available."

*Conley*, 2015-Ohio-2553, 43 N.E.3d 775, at ¶ 56, citing *Cook*, 65 Ohio St.3d at 524-525, 605 N.E.2d 70.

**{¶ 81}** Although Dr. Bergman testified that Blanton had not suffered from a blackout at the time he shot K.C., Blanton's trial counsel may have believed that Dr. Bergman's testimony was beneficial in other respects.  For example, Dr. Bergman confirmed that Blanton reported to her that he had blacked out and did not remember what had happened, which demonstrated consistency in Blanton's blackout claim.  Dr. Bergman's testimony also provided the jury with mitigating information concerning Blanton's background and mental health history.   Specifically, Dr. Bergman testified that Blanton had been severely behaviorally handicapped as a child, had been the victim of sexual abuse, and had witnessed domestic violence in his home.  Dr. Bergman also testified that Blanton had been diagnosed with PTSD and intermittent explosive disorder as an adult.   Counsel may have believed that this information had the potential to produce sympathy for Blanton and to show that Blanton was susceptible to mental health issues such as blackouts.   While counsel's strategy to call Dr. Bergman was debatable, it was nevertheless a legitimate strategy that cannot form the basis of an ineffective assistance claim.

**{¶ 82}** For the foregoing reasons, Blanton's fourth ineffective assistance claim lacks merit.

*Claim 5: Failure to Request Jury Instructions on Voluntary Manslaughter and*

*Aggravated Assault*

{¶ 83} For his fifth and last ineffective assistance claim, Blanton contends that his trial counsel's representation was deficient because counsel failed to request jury instructions on voluntary manslaughter and aggravated assault. We again disagree.

{¶ 84} "Voluntary manslaughter is an inferior degree of murder[.]" *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). "Voluntary manslaughter is proscribed in R.C. 2903.03(A), which states that '[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.' " *State v. Bonaparte*, 2d Dist. Clark No. 2018-CA-61, 2019-Ohio-2030, ¶ 69. "Thus, unlike murder, voluntary manslaughter includes the mitigating element of serious provocation by the victim reasonably sufficient to incite the defendant into using deadly force." *Id.*, citing *State v. Thomas*, 2d Dist. Montgomery No. 19131, 2003-Ohio-42, ¶ 17.

{¶ 85} In this case, there was no evidence presented at trial establishing that Blanton was under the influence of sudden passion or a fit of rage at the time of the shooting; Blanton simply testified that he blacked out during the shooting and did not remember what happened. Absent such evidence, a voluntary manslaughter instruction was not justified. Therefore, because Blanton's trial counsel had no basis to request a jury instruction on voluntary manslaughter, we cannot say that he performed deficiently by failing to request that instruction at trial.

{¶ 86} We reach the same conclusion with regard to Blanton's claim that his trial counsel was ineffective for failing to request a jury instruction on aggravated assault.

Aggravated assault is an inferior degree offense of felonious assault. *Conley*, 2015-Ohio-2553, 43 N.E.3d 775, at ¶ 32, citing *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-6527, ¶ 7, fn. 2. "Specifically, felonious assault is reduced to aggravated assault if the offender is 'under the influence of sudden passion or in a sudden fit of rage * * * brought on by serious provocation occasioned by the victim.' " *Id.* at ¶ 33, citing R.C. 2903.12(A) and *State v. Deem*, 40 Ohio St.3d 205, 210-211, 533 N.E.2d 294 (1988). Again, because there was no evidence presented at trial establishing that Blanton was acting under sudden passion or in a fit of rage as a result of serious provocation brought on by the victim, an aggravated assault instruction was not warranted.

{¶ 87} For the foregoing reasons, Blanton's fifth ineffective assistance claim lacks merit.

{¶ 88} Because all of Blanton's ineffective assistance claims lack merit, Blanton's fourth assignment of error is overruled.

## Conclusion

{¶ 89} Having overruled all four assignments of error raised by Blanton, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.