[Cite as *State v. Hypes*, 2019-Ohio-4096.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-110 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-243 |
| | : | |
| TRAVIS HYPES | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 4th day of October, 2019.

. . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Travis Hypes shot his former girlfriend in the head, killing her. He maintained that it was an accident, but a jury did not believe him and found him guilty of reckless homicide, felonious assault, and felony murder. The trial court merged the offenses and sentenced Hypes to an aggregate term of 18 years to life in prison. Hypes appeals from his conviction; we affirm.

## I. Facts and Procedural History

{¶ 2} Hypes and Lindsay Marsh began dating in 2017, when Hypes's sister, Madison Shaw, introduced them, and soon they were expecting a child together. Their relationship was of the on-again, off-again sort, and on April 5, 2018, it was off-again. Nevertheless, that day both Hypes and Marsh were invited to a cookout at Shaw's Springfield home, along with his mother and some others. Shortly after Hypes arrived, he and Marsh started arguing, which they often did. They continued to argue in the kitchen for 20-25 minutes before Hypes threatened to slap Marsh if she did not "shut up." This prompted Hypes's mother to intervene and tell him that he "need[ed] to stop." Tempers seemed to cool then, and people moved to other parts of the house. Hypes and Marsh remained in the kitchen. Shaw went outside to start the grill, which was on the patio, just outside the kitchen door. From there, she could hear Hypes and Marsh resume arguing. Shaw then heard a loud noise and rushed back into the kitchen, where she saw Hypes standing over Marsh, who was on the floor foaming at the mouth. When Hypes saw Shaw, he muttered, "Oh my God" and ran out the door.

{¶ 3} Others then rushed into the kitchen, and Hypes's mother called 911. When police arrived, Marsh was still conscious, a gunshot wound apparent on her head, just in

front of her left ear. The gun was found on the kitchen floor. Marsh was rushed to the hospital where she later died, but doctors were able to save the unborn baby.

{¶ 4} Hypes fled to his uncle's house. He confessed to his uncle that he had shot Marsh in the head and asked his uncle to help him flee; the uncle convinced Hypes that he needed to turn himself into the police. Police soon arrived at his uncle's house and arrested Hypes without incident.

{¶ 5} Hypes was then interviewed by two detectives from the Springfield Police Department. During the interview, a very distraught Hypes gave differing accounts of what happened. At first, he said that during a scuffle, Marsh "slapped the gun and it went off." He also claimed that, when she pushed him, he fell and the gun went off. Later in the interview, Hypes said that the gun went off when he pushed Lindsay with the hand holding the gun. Hypes told the detectives that he carried the gun for protection, because he was involved with a gang that was trying to kill him. He claimed that the shooting was an accident and that he never meant to hurt Marsh.

{¶ 6} Hypes was charged with one count of murder, in violation of R.C. 2903.02(A); one count of felony murder, in violation of R.C. 2903.02(B); and one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2). Each count was accompanied by a firearm specification. Hypes filed a motion in limine asking the trial court to order the state to redact statements that he made in his interview with detectives about his gang involvement and time spent in prison. The trial court did not explicitly rule on the motion. At the jury trial, a recording of the interview was played that omitted prison references but included gang references.

{¶ 7} On October 11, 2018, the jury found Hypes guilty of felony murder and

felonious assault; it found him not guilty of murder but guilty of the lesser-included offense of reckless homicide, in violation of R.C. 2903.041(A). The jury also found him guilty of the firearms specifications. The trial court merged all of the offenses and specifications, and the state elected to proceed on the felony murder. The trial court sentenced Hypes to 15 years to life for felony murder and an additional three years on the firearm specification.

{¶ 8} Hypes appeals.

## II. Analysis

{¶ 9} Hypes presents two assignments of error. The first argues that the state failed to prove that he was culpable for Marsh's death. The second argues that the trial court erred by allowing the statements about his gang involvement and also claims that by referring to his gang involvement during closing arguments, the prosecutor committed misconduct.

## A. Hypes's culpability

{¶ 10} The first assignment of error alleges:

The Evidence Presented at Trial was Insufficient and Against the

Manifest Weight of the Evidence to Sustain Hypes' Convictions.

{¶ 11} Hypes was found guilty of felony murder under R.C. 2903.02(B), which pertinently provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" He was found guilty of the predicate offense of felonious assault under R.C. 2903.11(A)(2), which pertinently provides: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means

of a deadly weapon[.]" Hypes was found guilty of reckless homicide under R.C. 2903.041(A), which pertinently provides that "[n]o person shall recklessly cause the death of another[.]"

{¶ 12} Hypes contends that the jury's findings were not supported by sufficient evidence and were against the manifest weight of the evidence, because the evidence failed to prove that he "knowingly" harmed Marsh or that he "recklessly" caused her death.

{¶ 13} An argument based on the sufficiency of the evidence challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 14} In contrast, when reviewing an argument challenging the weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case

in which evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 15}** There were no independent witnesses to the shooting. The only account of what happened was what Hypes told the detectives in his interview—an account that changed over the course of the interview. Hypes acknowledged that he and Marsh were arguing, and he said that Marsh was trying to push him away. At the beginning of the interview, Hypes said that he had the gun in his hand because he was trying to engage its faulty safety. He said that he was afraid that the gun would go off accidentally when Marsh shoved him. Hypes first said that the gun went off when she knocked his hand that was holding the gun. Then he said that it went off when he fell to the floor after she pushed him. But later in the interview, Hypes admitted that Marsh was mocking him and that this made him angry. He seemed to admit that when she started pushing him, he pulled the gun out of his pocket and brandished it in an attempt to scare her. This, at least, was an inference that could reasonably be made from his statements. When she saw the gun, said Hypes, she told him that she did not care about it and pushed him again. Hypes said that he used both his hands to shove her back, pushing her in the area of her left shoulder. It was then, he said, that the gun went off. It appears, therefore, that in the interview, Hypes tried to conceal or downplay his own culpability, which undermined the credibility of his account of what happened.

**{¶ 16}** Three important facts were well-established by the state's evidence. The first fact was that the gun fired because Hypes pulled the trigger. It did not go off on its own, contrary to what Hypes seemed to suggest in his interview with detectives. The state's firearms expert, Andrew McClelland, testified that it was simply impossible for the

gun to have gone off by itself. Although the gun was damaged, it was operable, said McClelland, and it would fire if the trigger were pulled. Based on his examination of the gun, McClelland testified that the gun would not fire if it were dropped straight down on its "butt end," would not fire if it were knocked on one side, and would not fire if it were shoved into someone. The only way that the gun would fire, said McClelland, was if the trigger were pulled.

{¶ 17} The second important fact established by the evidence was that Hypes pulled the trigger while holding the gun not more than six inches from Marsh's head. The coroner and forensic pathologist who performed the autopsy (and at least 2,500 other forensic autopsies), Dr. Robert Shott, testified that the gun was fired from, at the most, six inches away from the bullet's entry point, just in front of Marsh's left ear. He explained that, while he could not definitively say so, all the evidence supported finding that there was hard contact when the gun was fired—the gun was resting against Marsh's head. Dr. Shott said that the entrance wound showed dot-like abrasions on the skin that indicated a contact gunshot wound and lacerations radiating from the wound that suggested that the muzzle of the gun was pressed against the skin. Shott also testified that grey discoloration around the wound was caused by burned gunpowder. Further evidence supporting the finding that the gun was fired at very close-range came from Katherine Dailey, an expert in DNA analysis, who testified that Marsh's blood was found on the gun's muzzle. The detectives who interviewed Hypes also saw blood splatter on his right sleeve and right pant leg and on his right hand. Hypes told the detectives that he had held the gun in his right hand.

{¶ 18} The third important fact was that the gun was fired parallel to the floor. Dr.

Shott testified that the bullet travelled horizontally through the left side of Marsh's brain with very little vertical movement. Hypes told the detectives that the gun had gone off when he pushed Marsh in the area of her left shoulder, but if that were the case, one would logically expect to see vertical movement of the bullet from the shoulder area upward through her brain. The bullet's trajectory, then, called into serious question Hypes's account of the events.

{¶ 19} It is hard to say for certain what transpired between Hypes and Marsh. But based on all of the evidence, a jury could reasonably infer a scenario of what happened. Hypes and Marsh were arguing in the kitchen. She started pushing him and mocking him. His anger rising, Hypes pulled out the gun and threatened Marsh with it. She was not cowed by the gun and continued her taunts. Standing about an arm's length away, Hypes then raised his right arm and pointed the gun at her head, his finger on the trigger. Hypes pulled the trigger. This scenario accounts for the characteristics of the entrance wound, the location of the bullet's entrance, and the trajectory of the bullet through the left side of Marsh's brain.

{¶ 20} The record supports a conclusion that Hypes did the acts forbidden by the felonious-assault and reckless-homicide statutes. Indeed, he does not dispute that he "cause[d] physical harm" to Marsh "by means of a deadly weapon," R.C. 2903.11(A)(2), or that he "cause[d]" her death, R.C. 2903.041(A). What Hypes does dispute is that he committed the acts with the requisite degrees of culpability. He contends that the evidence did not show that he harmed Marsh "knowingly," R.C. 2903.11(A)(2), or killed

her "recklessly," R.C. 2903.041(A).[1]

{¶ 21} Under Ohio law, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result[.]" R.C. 2901.22(B). The standard for recklessness is lower: "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result[.]" R.C. 2901.22(C).[2] " 'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur[.]" R.C. 2901.01(A)(8). "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Fox*, 2018-Ohio-501, 106 N.E.3d 224, ¶ 14 (10th Dist.). A defendant's state of mind must be determined from the totality of the circumstances surrounding the alleged crime. *Id.*

{¶ 22} "It is common knowledge that a firearm is an inherently dangerous instrumentality, use of which is reasonably likely to produce serious injury or death." *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 25, citing *State v. Widner*, 69 Ohio St.2d 257, 270, 431 N.E.2d 1025 (1982). The evidence here supported the jury's finding that Hypes pulled the trigger of a loaded and cocked gun while holding the gun very near and pointed at Marsh's head. The jury could have reasonably inferred he was

---

[1] Felony murder under R.C. 2903.02(B) is a strict-liability offense in the sense that if the offender acts with the culpable mental state of the underlying first or second degree felony of violence, proximately resulting in death, then he is also guilty of felony murder. In this case, because if Hypes was found guilty of felonious assault, he could also be found guilty of felony murder.

[2] R.C. 2901.22(C) was amended, effective March 23, 2015, to replace the text "he perversely disregards a known risk" with "the person disregards a substantial and unjustifiable risk." We have said that "[t]he changes appear to be for clarity but, if anything, lower the standard by substituting a 'substantial and unjustifiable risk' in place of a 'known risk.' " *State v. Webber*, 2015-Ohio-2183, 35 N.E.3d 961, ¶ 10, fn. 1 (2d Dist.).

aware that doing this would probably cause her physical harm. *Compare Fox* at ¶ 14, citing *State v. Jefferson*, 6th Dist. No. L-16-1182, 2017-Ohio-7272, ¶ 17 ("Evidence that a defendant fired a gun in a person's direction is sufficient evidence that the defendant acted knowingly for the purpose of a felonious assault conviction."). The jury could also have reasonably concluded he was aware there was a strong possibility that pulling the trigger would kill Marsh. *See Willis* at ¶ 25. We conclude that the jury's findings with respect to felonious assault, felony murder, and reckless homicide were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 23} The first assignment of error is overruled.

### B. Motion in limine and prosecutorial misconduct

{¶ 24} The second assignment of error alleges:

The trial court abused its discretion when it overruled the motion in limine and the Prosecutor's misconduct caused extreme prejudice to Hypes in violation of his Due Process Rights to a Fair Trial when this prejudicial evidence was argued to the jury during closing argument.

### 1. *The motion in limine*

{¶ 25} " 'A motion in limine is a motion directed to the inherent discretion of the trial court judge to prevent the injection of prejudicial, irrelevant, inadmissible matters into trial.' " *Lingo v. Leeper*, 2d Dist. Montgomery No. 18865, 2002 WL 360661, *1 (Mar. 8, 2002), quoting *Mason v. Swartz*, 76 Ohio App.3d 43, 55, 600 N.E.2d 1121 (6th Dist.1991). "[D]ecisions granting or denying a motion in limine are reviewed under an abuse-of-discretion standard of review." (Citation omitted.) *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. "The admission of

evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." (Citation omitted.) *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. We must determine "whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues" about which Hypes complains. *Id.*

{¶ 26} Hypes's motion in limine asked the trial court "to order the State to redact specific statements made by the Defendant in a recorded interview of the Defendant. During the Defendant's interview he makes various statements which are not relevant to the case at hand and which, even if relevant, would be more prejudicial than probative." The motion identifies specific statements that Hypes made about his gang involvement and previous time in prison.[3] There is no explicit ruling on the motion in limine in the record, but the parties agree that the record shows that the trial court sustained the motion with respect to statements about prison. This exchange occurred at a bench conference during the trial:

> [DEFENSE COUNSEL]: You're gonna play the video of Travis, right? So rather than—I don't want to interrupt the—I want to just proceed with respect to the items listed in the motion in limine with respect to that.
>
> THE COURT: Okay. Did you redact the additional?

---

[3] Specifically, Hypes tells the detectives, "I'm a Latin King," and he says that the Kings are trying to kill him. Hypes also makes a statement about someone asking questions about why he (Hypes) is "still out," that is, why he was not in prison. Hypes also tells the detectives that he's been stabbed "since I've been home," referring to his release from prison. Finally, Hypes mentions something someone did to him "when I first came home," another apparent reference to his release from prison.

[STATE]: We did.

THE COURT: Okay. Than you.

(Tr. 215-216). Later, when the state played the recording of the interview for the jury:

[STATE]: Your Honor, at this time, with permission of the Court, I would like to show the defendant's interview, which would be marked as State's Exhibit #1A. This is a redacted version, Your Honor.

[DEFENSE COUNSEL]: Note my continuing objection.

THE COURT: All right. You can proceed.

(*Id.* at 221).

{¶ 27} The recording played at trial contains statements about Hypes's gang involvement, including that the gang was trying to kill him. It is this evidence that Hypes contends was irrelevant and unfairly prejudicial. He argues that it could have led the jury to find him guilty to punish him for being in a gang, as it was his gang involvement that led him to carry a gun for protection. But Hypes himself arguably opened the door to this evidence when he told the jury in his opening statements that he carried the gun to protect himself:

And he had a gun in his pocket and you'll hear evidence about why. He'd been threatened. He'd been pushed down stairs. He'd been shot at. He'd been stabbed, so he started to carry a gun. And you're going to hear his story because he was interviewed and that interview was videotaped and you're going to see it.

And you're going to hear how he tells the detective, "I was in danger. My life was in danger. My family was in danger, so I got a gun." * * *

(*Id.* at 110).

**{¶ 28}** These statements undoubtedly left the jury wondering who threatened, pushed, and shot at Hypes. The evidence about his gang involvement provided the answer. Hypes himself made the evidence relevant. Furthermore, given all the other evidence, we do not believe that the exclusion of the evidence about Hypes's gang involvement would have changed the jury's verdicts.

### 2. *Prosecutorial misconduct*

**{¶ 29}** Hypes also contends that the state committed prosecutorial misconduct by referring to this gang evidence during closing statements. He says that the state improperly inflamed the jury by arguing that it was Hypes's gang involvement that led to Marsh's death, as it was because he was in the gang that he believed he needed to carry a gun for protection. As Hypes concedes, he did not object to these comments when they were made, so he has waived all but plain error. *See State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 82 (saying that the defendant's "failure to object to these comments waived all but plain error").

**{¶ 30}** Here's what the prosecutor said:

He's carried the gun for two months and he wants you to believe, on multiple occasions, he was involved in physical altercations with folks.

Presumably, folks who were going to try and kill him, because that's what he wants you to believe. And he took the gun out, sat it down, and said. "All right, let's go." Why is he carrying the gun? Why is he carrying the gun? Is it because the Latin Kings are trying to kill him[?]

Let's talk about that. Let's talk about that. Shot at, stabbed, thrown

downstairs. All right. No police reports, no ambulance runs. He says he lays at the bottom of a stairwell in an apartment complex for two hours. No one calls an ambulance? No one calls the police? He tells you that he loves Lindsey; he loves his child; that they're being threatened as well. He's never told them. He's never given her a heads up, "Hey, if you see some Latin Kings, stay away from them. They're going to try and kill you."

Does that make sense? Are you not going to tell the person you love, the person you care about, that their life is in danger? Are you going to send them out on the streets of Springfield without giving them a warning that they may be the target?

Are you going to do that? Detective Jordan asked him if he's had his ankle checked out. "Oh no, I couldn't go to the hospital. I'm too afraid. I'm too afraid to go to the hospital."

But he can walk from Delta Road Apartments to McCreight, open and obvious, on the streets of Springfield. But, "I'm afraid to go to a hospital. I'm mad because they won't take me to the Save-a-Lot and get me food. I'm so scared. I can't go to a hospital."

It turns out, when you make stuff up, it doesn't make sense. It turns out, when you make stuff up, it changes. Ask yourself, is that what we're seeing here? Is that what's going on?

(Tr. 376-378).

**{¶ 31}** "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey*, 64 Ohio St.3d 353, 362, 595

N.E.2d 915 (1992). The prosecutor's comments here were not misconduct. The prosecutor merely suggested that Hypes lied to the officers about what happened. These statements amounted to fair comment on the evidence. We see no plain error.

{¶ 32} The second assignment of error is overruled.

### III. Conclusion

{¶ 33} We have overruled both assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

John M. Lintz
Ben M. Swift
Hon. Douglas M. Rastatter