[Cite as *State v. Skirvin*, 2026-Ohio-376.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30462 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 00067 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JAMES MICHAEL SKIRVIN | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on February 6, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

CHIMA R. EKEH, Attorney for Appellant
ANDREW T. FRENCH, Attorney for Appellee

EPLEY, J.

{¶ 1} After a jury trial in the Montgomery County Court of Common Pleas, James Michael Skirvin was convicted of four counts of felonious assault, two counts of aggravated menacing, and one count each of failure to comply with an order or signal of a police officer, discharge of a firearm on or near prohibited premises, and aggravated possession of drugs.

{¶ 2} Skirvin appeals from his convictions, claiming that the trial court erred in failing to give certain jury instructions and that various convictions were based on insufficient evidence and against the manifest weight of the evidence. For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 3} On the morning of January 8, 2024, Skirvin and his adult daughter were visiting Skirvin's brother, who resided at the Voyager Village mobile home community in Trotwood. Skirvin and his daughter got into an extended argument, and eventually, the daughter left with her belongings and her small dog, saying she was going to call for a ride. She went to the community office building and waited on a wooden bench in front of the building.

{¶ 4} Sometime after his daughter left, Skirvin received a phone call, which became heated. After the call ended, he left the residence, telling his brother that he was going to "go up there to smash her." Skirvin drove to the office building and accelerated his white Ford F-550 "dually" pickup truck into and over his daughter, demolishing the bench on which she was sitting and knocking her out of her shoes. Remarkably, the daughter received only

2

minor injuries. Skirvin then backed up and returned to his brother's home. The community manager and a resident who lived across the street from the office both witnessed the incident and called 911.

{¶ 5} After telling his brother what he had done, Skirvin said that he was going to get the police to kill him, and he advised his brother to leave his home with his dogs. Skirvin's brother left and went to the office building. Skirvin retrieved a rifle and a shotgun that he had brought with him from Florida.

{¶ 6} At 11:04 a.m., Sergeant Brent Rasor of the Trotwood Police Department responded to the assault on Skirvin's daughter. Within a minute of his arrival, Skirvin drove past the office building, heading southbound toward the exit onto West Third Street (which at that location was also designated U.S. Route 35). Skirvin held a black shotgun out the driver's window, pointing it toward the building as he went by. Skirvin's brother later told Rasor that Skirvin had "snapped" and intended "suicide by cop," and that Skirvin had both a shotgun and a rifle.

{¶ 7} As Skirvin continued toward the exit, two Trotwood cruisers were driving northbound toward the office building. Officer (now Detective) Paul Dapkus told his partner, Officer Ezra Haponek, to turn their cruiser around. They did a U-turn and followed Skirvin onto eastbound West Third Street. As they were turning, Rasor advised that the white pickup was the suspect's vehicle, that Skirvin had a long gun, and that officers could pursue him under the department's pursuit policy. Officer Dafina Taylor, who had entered the Voyager Village community ahead of Dapkus and Haponek, also turned around and joined the pursuit.

{¶ 8} Skirvin drove eastbound on West Third Street at speeds approaching 95 mph in a 45 mph zone, and Officer Dapkus observed him driving erratically. Skirvin drove left of

3

center and almost head-on into a semi-truck, and he forced Officer Dustin Johnson, who was also responding to Voyager Village, to drive off the north side of the road to avoid a collision. When Skirvin passed the intersection with Union Road, he was traveling at 75 mph.

{¶ 9} At the junction with State Route 49, Skirvin turned right to stay on U.S. Route 35, where it became a divided roadway. He initially slowed his speed to 40 mph, and Officer Dapkus could see that he was still holding a gun out of the driver's window. As they approached Liscum Drive, Skirvin sped up to approximately 75 mph again, and Dapkus observed Skirvin sticking his hand out the window and making hand signs. Skirvin was also "acting erratically in the cab of the vehicle, almost as if he [was] having a very animated argument with someone."

{¶ 10} As Skirvin continued eastbound, Dayton Police Sergeant Gordon Cairns parked along the westbound side of the median between Gettysburg and Abbey Avenues. As he heard reports of Skirvin's progress along U.S. Route 35, Cairns placed Stop Sticks, a tire deflation device, in the roadway. Soon after, Detective (now Captain) Joshua Samples of the Montgomery County Sheriff's Office parked a short distance in front of Cairns's vehicle and got out additional Stop Sticks. Samples threw his Stop Sticks onto the roadway when Skirvin moved into the left eastbound lane to avoid Cairns's Stop Sticks.

{¶ 11} Just before reaching the Stop Sticks that Samples had placed, Skirvin fired his shotgun, which was still pointed out the driver's window. He then drove over the Stop Sticks but kept going.

{¶ 12} At Abbey Avenue, Skirvin made a U-turn and proceeded westbound on U.S. Route 35. As he again approached Cairns and Samples, the officers saw that the shotgun was still sticking out the window. Samples testified that Skirvin again fired at them, although

4

Skirvin denied that at trial. As Skirvin neared and passed them, the officers shot at Skirvin with their rifles, striking the pickup.

{¶ 13} Skirvin kept going and then dropped his shotgun out of the window. As Skirvin approached the Liscum Drive intersection, his vehicle picked up speed. At the intersection, he veered left across several lanes and drove into the oncoming lane of travel, striking a marked Montgomery County Sheriff's cruiser and a Trotwood police cruiser that were parked together in the eastbound lanes. The cruisers were pushed off the roadway into the grass, and the pickup came to rest on top of the Trotwood vehicle; both cruisers suffered extensive damage. Skirvin narrowly missed hitting a deputy who was standing in the roadway. Trotwood Police Officer Michael Richardson was seated inside his cruiser when it was struck and crushed by Skirvin's pickup; he suffered severe injuries from the collision.

{¶ 14} When Officer Dapkus exited his vehicle, he saw an AR-style rifle pointed out of the driver's window of the pickup. Numerous officers fired their weapons toward Skirvin's vehicle, and Skirvin dropped the rifle to the ground. When Skirvin stopped moving, Dapkus called for a ceasefire. Officers slowly approached the pickup, and Skirvin was initially unresponsive. Skirvin was pulled from his truck and handcuffed, and officers provided first aid until he was transported to the hospital.

{¶ 15} The Ohio Bureau of Criminal Investigation ("BCI") took charge of the scene. Investigators collected a broken shotgun from U.S. 35 near the Gettysburg exit and the rifle that had been dropped from Skirvin's vehicle after the crash. After obtaining a search warrant for Skirvin's truck, a BCI crime scene investigator located a spent shotgun shell on the dashboard. A cooler with drug paraphernalia was found on the back passenger floorboard; BCI did not collect the drug-related items. A few days later, an evidence technician with the Montgomery County Sheriff's Office processed Skirvin's pickup and collected suspected

5

drugs found in a tin, as well as some bullet rounds. The parties stipulated at trial that the drugs were 1.11 (plus or minus 0.02) grams of methamphetamine.

{¶ 16} On January 17, 2024, Skirvin was indicted for felonious assault and domestic violence based on his assault on his daughter. Indictment A. Several weeks later, the State reindicted Skirvin on eleven additional charges: felonious assault on a peace officer (serious physical harm) (Officer Richardson); five counts of felonious assault on a peace officer (deadly weapon) (one count for Officer Richardson and two each for Sergeant Cairns and Detective Samples); vehicular assault (Officer Richardson); failure to comply with an order or signal of a police officer (serious physical harm/substantial risk); discharge of a firearm on or near prohibited premises; improper handling of a firearm in a motor vehicle; and aggravated possession of drugs. Each of the charges concerning Sergeant Cairns and Detective Samples included a three-year firearm specification and a five-year specification for discharging a firearm from a motor vehicle. Indictment B.

{¶ 17} The matter proceeded to a jury trial in April 2025. For ease of reference, the charges in the second indictment were renumbered Counts 3 through 13. Of relevance here, renumbered Counts 3, 4, and 9 related to the felonious and vehicular assault on Officer Richardson, Counts 5 and 6 alleged felonious assault as to Detective Samples, and Counts 7 and 8 alleged felonious assault as to Sergeant Cairns.

{¶ 18} The State presented numerous witnesses, including Skirvin's brother, the Voyager Village community manager, the resident-witness, Sergeant Rasor, Sergeant Cairns, Detective Samples, other officers who had participated in the pursuit of Skirvin's truck, a BCI crime scene investigator, a crash reconstructionist, and a firearm examiner. The State also offered approximately 60 exhibits, predominantly photographs and video recordings. Skirvin testified on his own behalf.

{¶ 19} Over the State's objection, the trial court provided a jury instruction on aggravated menacing as to Counts 6 and 8, which were based on Skirvin's alleged shooting at Samples and Cairns while driving westbound on U.S. 35 (second pass). The court denied Skirvin's request for a jury instruction on aggravated menacing on Counts 5 and 7, the eastbound shooting. After deliberating, the jury found Skirvin guilty of aggravated menacing as to Count 6 and 8 and guilty as charged as to the other counts and specifications. At sentencing, the court merged several counts and specifications and imposed an aggregate term of 58 to 63½ years in prison on Counts 1, 3, 5-8, 10, 11, and 13.

{¶ 20} Skirvin raises six assignments of error on appeal. We address them in a manner that facilitates our analysis. None of Skirvin's assignments of error concern his convictions for the felonious assault of his daughter (Count 1), aggravated menacing (Counts 6 and 8), failure to comply (Count 10), or discharge of a firearm on or near prohibited premises (Count 11). Accordingly, we summarily affirm those convictions. *See* App.R. 12(A)(1)(b) and 16; *State v. Reid*, 2023-Ohio-2217 (2d Dist.) ("an appellate court may summarily affirm the trial court's judgment when an appellant fails to set forth and argue any assigned error").

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 21} Skirvin's first, third, fourth, and sixth assignments of error challenge four of his convictions as based on insufficient evidence or as against the manifest weight of the evidence. His first assignment of error concerns the manifest weight of the evidence as to Count 3 (felonious assault on Officer Richardson). His third and fourth assignments of error relate to the sufficiency and manifest weight of the evidence as to Counts 5 and 7 (felonious assaults on Detective Samples and Sergeant Cairns). His sixth assignment of error argues

7

that his conviction for aggravated possession of drugs was against the manifest weight of the evidence.

{¶ 22} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id*.

{¶ 23} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**A. Counts 5 and 7: Shooting on Eastbound S.R. 35**

{¶ 24} In his third (sufficiency) and fourth (manifest weight) assignments of error, Skirvin challenges his convictions on Counts 5 and 7, which were based on his alleged

8

shooting at Sergeant Cairns and Detective Samples while traveling eastbound on U.S. 35. Although Skirvin admitted at trial that he had fired his shotgun while approaching the officers, he asserts that he did not aim at them and that he was not trying to hurt them.

{¶ 25} Counts 5 and 7 charged Skirvin with felonious assault on a peace officer in violation of R.C. 2903.11(A)(2). The statute provides that no person shall knowingly "[c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Skirvin acknowledges that intentionally shooting a firearm in the direction of another person is sufficient to satisfy the "knowingly" element of felonious assault. Appellant's Brief, p. 15, citing *State v. Wilson*, 2024-Ohio-776, ¶ 24 ("Intentionally shooting toward or in the vicinity of another person when there is a risk of injury meets the 'knowingly' element of felonious assault.").

{¶ 26} Sergeant Cairns and Detective Samples testified, and the video recording from Cairns's cruiser substantiated, that the officers parked along the median on the westbound side of U.S. 35 while Skirvin proceeded toward them on eastbound U.S. 35. Cairns arrived first and deployed Stop Sticks; Samples arrived second, parking several car-lengths in front of Cairns's cruiser. Samples deployed his Stop Sticks shortly before Skirvin reached him.

{¶ 27} As Skirvin's pickup approached, Samples could see that Skirvin was holding a long gun out of the driver's side window and that the gun was pointed toward Cairns and him. Trial Tr. 289. Samples could not say if Skirvin was aiming at Cairns or him, but Samples could tell that the weapon was not pointed toward the sky or at the ground.

{¶ 28} When Skirvin was approximately 10 to 15 feet from Samples's Stop Sticks, he fired his shotgun. At that time, Samples was standing in front of the open trunk of his vehicle, and Cairns was approximately 50 feet away, standing at the back of his cruiser on the driver's side, trying to adjust his Stop Sticks. It took both officers a moment to realize that

Skirvin had just shot at them. Cairns testified that he saw "the barrel of a shotgun sticking out the window right at us" as Skirvin drove past. Trial Tr. 259.

{¶ 29} Cairns and Matthew White, a forensic firearm examiner with BCI, both discussed how shotguns operate. Cairns initially explained that a rifle shoots a single shot with each pull of the trigger, whereas a shotgun "can shoot a blast of rounds at you at a time." Trial Tr. 265. White similarly stated that shotguns generally shoot a spray of pellets and those pellets expand outward. Both indicated that a choke can be fitted in the end of a shotgun barrel to constrict the spread of the shot so that the pellets would hold a tighter pattern at a longer distance. White testified that there was no standard dispersion rate and no way to accurately determine the spread of the pellets themselves. Rather, multiple variables affect dispersion, including the pellet size, power of the shell, length of barrel, and type of wadding.

{¶ 30} White examined the broken 16-gauge semi-automatic Browning shotgun that was recovered from U.S. 35 and determined that it had fired the spent shotgun shell that was recovered from Skirvin's vehicle. Skirvin's shotgun did not have a choke. Information on the spent shotgun shell indicated that it had a "dram equivalent" (power of the shell) of 3¼, that the pellets weighed one ounce, and that the size of the pellets was Number 6, which would be used for hunting turkey or duck. Detective Samples described birdshot as small pellets. He testified that the dispersion upon exiting the shotgun "is pretty wide" and would get wider the farther it traveled. Samples stated that birdshot could be deadly (Skirvin also acknowledged that it could injure people) and that a person firing birdshot could be "a little less accurate, I guess, as far as where you're aiming at." Trial Tr. 297.

{¶ 31} Finally, Samples discussed the difficulty of shooting a firearm from a moving vehicle. He explained that shooting from a moving vehicle presents several challenges due

10

to the shooter's position in the vehicle, any physical restrictions from the vehicle (such as a steering wheel or wearing a seat belt), the type of window, the field of fire (up, down, left, right), the road conditions, and the need to simultaneously operate the vehicle if the shooter is driving. Samples stated that using a shotgun, rather than a pistol or rifle, when shooting from a moving vehicle would increase the likelihood of accurately hitting someone.

{¶ 32} During his testimony, Skirvin confirmed that he had fired his shotgun "in the general direction of" Cairns and Samples just before encountering Stop Sticks on the roadway. He said that the gun was still across his lap but that he had raised it with his right hand so that it was no longer resting on the window frame. He explained, "[I]t's not like I raised it all the way up and touched the top of the truck or anything. I literally just picked it up, moved it off of the door itself and fired the weapon." Skirvin further testified that he saw the officers' vehicles but not the officers themselves when he fired. He assumed, however, that given the presence of the cruiser, the officers were there.

{¶ 33} Skirvin was familiar with firearms, and he provided his opinions about the dangerousness of birdshot and the risk of harm based on distance and dispersal. He expressed that the chances of striking someone with birdshot lessened the more the shot dispersed, and he believed the chance of killing someone (or even a bird) with one pellet was very limited. He acknowledged that a larger dispersal increased the likelihood of hitting something.

{¶ 34} Viewing the evidence in the light most favorable to the State, we conclude that the State's evidence was sufficient to prove felonious assault on Cairns and Samples as charged in Counts 5 and 7. Skirvin acknowledged that he had fired a shotgun with birdshot in the officers' general direction, and the officers testified that the gun was pointed toward them. Although Cairns indicated that he was approximately 50 feet away from Samples

11

when Skirvin discharged his shotgun, the jury could have reasonably found that Skirvin had attempted to cause physical harm to both officers, particularly considering that Skirvin saw both vehicles, that he was driving toward them at a high rate of speed, that he fired in the officers' direction before reaching them, and that he used a shotgun without a choke, allowing for the widest spray.

{¶ 35} We also cannot conclude that his convictions on Counts 5 and 7 were against the manifest weight of the evidence. The jury was presented with the testimony of multiple witnesses, and it had photographs and video recordings of the incident to review. It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Skirvin committed felonious assault on Cairns and Samples. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.).

{¶ 36} Skirvin testified that his goal in firing his shotgun was to escalate the situation, and he emphasizes on appeal that neither Samples nor his police vehicle was hit by birdshot, thus supporting his claim that he had intentionally fired into the air and was not aiming at the officers. Cairns and Samples both testified that neither they nor their vehicles were hit by any projectile. No birdshot was collected from their location. However, even if the jury believed that the pellets went over the officers' heads, the jury was not required to credit Skirvin's testimony that he had intentionally fired upward, particularly when Cairns testified that the shotgun was pointed at him as Skirvin drove by moments later. Rather, the jury could have reasonably concluded that Skirvin had attempted to cause physical harm to both officers with his shotgun but had failed to do so due to the challenges of aiming from a rapidly-moving vehicle. Upon review of the evidence, we cannot conclude that the jury lost

its way when it ostensibly credited the State's evidence and found that Skirvin committed felonious assault as charged in Counts 5 and 7.

**{¶ 37}** Skirvin's third and fourth assignments of error are overruled.

### B. Count 3: Crash Into Officer Richardson's Cruiser

**{¶ 38}** In his first assignment of error, Skirvin claims that his conviction for felonious assault against Officer Richardson was against the manifest weight of the evidence because he did not voluntarily collide with cruisers at the Liscum intersection. Skirvin contends that he was "in a state of gunshot-induced unconsciousness" when he crashed into Richardson's cruiser. He points to his own testimony, the descriptions of his physical condition after the crash, and the descriptions of his vehicle's condition after he went over the Stop Stick.

**{¶ 39}** In Count 3, Skirvin was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which prohibits a person from knowingly causing serious physical harm to another. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Skirvin does not dispute that he crashed into Officer Richardson's cruiser, causing serious physical harm.

**{¶ 40}** To be convicted of a criminal offense, a defendant's conduct must have been both voluntary and performed with the requisite degree of culpability (purpose, knowledge, recklessness, or negligence). *See* R.C. 2901.21(A) and 2901.21(F)(3). Proof that the defendant committed a criminal act with the requisite mental state is necessarily evidence that the defendant acted voluntarily. *State v. Ireland*, 2018-Ohio-4494, ¶ 34.

**{¶ 41}** Involuntary acts include "reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the

13

actor's volition." R.C. 2901.21(F)(2). A claim that the defendant was unconscious when the act was committed, and thus did not commit the act voluntarily, is an affirmative defense. *Ireland*, 2018-Ohio-4494.

{¶ 42} "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Hypes*, 2019-Ohio-4096 ¶ 21 (2d Dist.), quoting *State v. Fox*, 2018-Ohio-501, ¶ 14 (10th Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991); *State v. St. John*, 2019-Ohio-650, ¶ 49 (2d Dist.). In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2018-Ohio-3506, ¶ 16 (2d Dist.).

{¶ 43} Testifying on his own behalf, Skirvin stated that he was fading into unconsciousness when the crash occurred. He elaborated that when he drove westbound toward Sergeant Cairns and Detective Samples's location, the officers fired on him, striking him in the arm, leg, and chest. His arm was very painful, his leg felt like it was on fire, and one of his lungs was filling with fluid. Skirvin stated that he tried to maintain control of his vehicle as he was losing consciousness. His last memory before the crash was driving and trying to breathe; he did not recall the collision. Skirvin came from a law enforcement and military background and had been in the military himself; he testified that he "respected the uniform." He denied that he intended to hurt any officer, and he maintained that he had tried to avoid injuries to others during the pursuit.

{¶ 44} Skirvin argues the condition of his vehicle prior to and after the crash, as well as the testimony of officers who approached his vehicle after the crash, buttressed his claim that he did not voluntarily crash into Richardson's cruiser. He notes that Cairns and Samples

14

shot approximately 19 bullets at his vehicle on his second pass by them, and when he drove on, the front driver's side tire was deflated, the windshield was shot out, and there was white smoke coming from the vehicle. Following the crash, the right front tire was shredded and the left front tire was bent inward. Skirvin further points to testimony from Officer Dapkus and Sergeant Molchan that he was unresponsive when they reached the pickup following the crash; Molchan stated that Skirvin woke up once they gave commands.

{¶ 45} The State's evidence, however, supported the opposite conclusion that Skirvin had knowingly and voluntarily crashed into the cruisers at the Liscum intersection. Several police vehicles followed Skirvin as he sped along eastbound U.S. 35, and more joined the pursuit when he turned around at Abbey Drive. Cruiser videos showed that Skirvin was able to drive straight within his lane after Cairns and Samples fired on him. Deputy Michael Beach testified that Skirvin maintained his lane until he veered left. The jury could have reasonably concluded that Skirvin was conscious and steering his pickup as he approached the Liscum intersection. Additionally, although Skirvin testified that he sustained his gunshot wounds when he was fired upon by Cairns and Samples, the jury could have reasonably questioned the veracity of that claim, given that numerous officers fired at Skirvin's stationary vehicle after it crashed.

{¶ 46} Officer Dapkus's testimony further supported that Skirvin remained conscious up to and immediately after the crash. Dapkus's cruiser was immediately behind Skirvin throughout the pursuit, and he saw Skirvin throw his shotgun out the window while driving westbound on U.S. 35. After the crash, the officer exited his cruiser and saw the barrel of an AR-style rifle pointing out of Skirvin's window. He and other officers fired on Skirvin's vehicle. Dapkus then saw the rifle being thrown from the truck. Once Officer Dapkus stopped seeing movement from Skirvin, he called for a ceasefire until all officers stopped firing. Although

15

Skirvin was unresponsive when officers approached the pickup and ordered him to raise his hands, the evidence supported a reasonable conclusion that Skirvin was conscious leading up to and during the crash and that he remained so at least until he dropped the rifle from his vehicle.

{¶ 47} Finally, although there was substantial evidence regarding the condition of pickup's tires and the vehicle's behavior as it veered toward the cruisers, none of that evidence was indicative of Skirvin's mental or physical condition. Numerous officers testified that the pickup's right front tire was shredded and smoking as Skirvin approached the Liscum intersection; Sergeant Cairns also saw the left front tire deflating. However, neither party presented evidence about how the condition of the tires would have affected the vehicle's path of travel (left, right, or straight) if Skirvin were unconscious. Officer Beach testified that he did not observe brake lights or skid marks when Skirvin veered left, but there was no testimony indicating whether this supported or refuted Skirvin's claim that he was unconscious when the crash occurred. Finally, several officers testified that the pickup accelerated as it veered across the Liscum intersection. Sergeant Kleman, a certified crash reconstructionist, calculated Skirvin's average speed in three locations and noted an increased average rate of speed before the crash. However, no one addressed whether the acceleration was indicative of consciousness.

{¶ 48} With the evidence before it, the jury could have reasonably rejected Skirvin's contention that he was unconscious and acted involuntarily when he crashed into Officer Richardson's cruiser. Skirvin's conviction for felonious assault in Count 3 was not against the manifest weight of the evidence. Accordingly, his first assignment of error is overruled.

### C. Count 13: Aggravated Possession of Drugs

{¶ 49} In his sixth assignment of error, Skirvin claims that his conviction for aggravated possession of drugs was against the manifest weight of the evidence. He agrees that methamphetamine was in his truck but maintains that he did not knowingly possess it.

{¶ 50} Skirvin was convicted of aggravated possession of drugs, in violation of R.C. 2921.11(A). This statute provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A).

{¶ 51} "'Possess' or 'possession' means having control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession of a drug may be either actual physical possession or constructive possession. *State v. Mabry*, 2007-Ohio-1895, ¶ 18 (2d Dist.). "A person has constructive possession of an object when he or she is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within his or her immediate physical possession." *State v. Keister*, 2022-Ohio-856, ¶ 44 (2d Dist.). "Establishment of ownership is not required." *State v. Rastbichler*, 2014-Ohio-628, ¶ 33 (2d Dist.).

{¶ 52} Courts may consider all the facts and circumstances surrounding the incident to determine whether an individual knowingly possessed an item. *State v. Rupert*, 2024-Ohio-5027, ¶ 12 (2d Dist.). "Evidence that drugs were discovered in close proximity to the accused may constitute sufficient circumstantial evidence to support a finding of constructive possession." *State v. Eastridge*, 2002-Ohio-6999, ¶ 31 (9th Dist.), quoted by *Rupert* at ¶ 12.

{¶ 53} According to Skirvin's version of events, he arrived at his brother's home on January 3, 2024. Two days later, he picked up his daughter and her girlfriend in Kentucky and brought them to Dayton. In the early morning hours of January 8, the group "partied."

17

Skirvin testified that they smoked methamphetamine and that he and his brother split a six-pack. Skirvin acknowledged that he had occasionally used methamphetamine while in Florida. He stated, however, that his daughter had provided the methamphetamine on January 8, 2024.

{¶ 54} Skirvin told the jury that his daughter and her girlfriend began to argue, and after efforts to deescalate the situation failed, he offered to drive them back to Kentucky. Skirvin testified that the luggage found in his vehicle following the crash belonged to his daughter and her girlfriend; his belongings were still at his brother's home. He claimed that he was unaware that the luggage contained methamphetamine.

{¶ 55} In contrast, when Skirvin's brother described the events of January 8, 2024, at trial, he made no mention of a girlfriend coming with his niece to his home. Instead, he said that Skirvin and his niece had arrived around January 6, that the two had gotten into an argument on January 8, and that his niece then left his residence. When the community manager saw Skirvin's daughter sitting on the wooden bench, the manager noticed that she had a duffel bag with her. During the investigation that ensued after Skirvin ran into his daughter with his truck, photographs were taken of the area where she had been sitting. The photographs showed duffel bags and a backpack on the sidewalk and among the debris from the incident.

{¶ 56} BCI crime scene investigator Amy Cruey searched Skirvin's vehicle after the Liscum crash and found drug-related items in a cooler on the back passenger floorboard; she did not collect those items. She also looked inside the luggage in the vehicle, but she testified that she did not recall its contents. Deputy Matthew Poulton did a secondary processing of the pickup a few days later and collected the methamphetamine. He also went

through duffels and suitcases in the backseat area, but he similarly could not recall what they contained.

{¶ 57} Based on the evidence before it, the jury could have reasonably rejected Skirvin's version of events and concluded that he knowingly possessed the methamphetamine located in his truck. Skirvin's conviction was not against the manifest weight of the evidence.

{¶ 58} Skirvin's sixth assignment of error is overruled.

### III. Jury Instructions

{¶ 59} In his second and fifth assignments of error, Skirvin claims that the trial court erred by failing to provide certain jury instructions. His second assignment of error contends that the trial court should have sua sponte provided a "blackout" instruction regarding Count 3, the Liscum crash. His fifth assignment of error asserts that the trial court erred by refusing to give an instruction on aggravating menacing for Counts 5 and 7, the eastbound U.S. 35 shooting. We address these assignments of error in reverse order.

{¶ 60} Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). A trial court must fully and completely give jury instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder. *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; *State v. Portis*, 2021-Ohio-608, ¶ 46 (2d Dist.).

{¶ 61} "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." *State v. Fair*, 2011-Ohio-4454, ¶ 65 (2d Dist.). An abuse of discretion occurs when the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219

19

(1983). We review de novo whether a jury instruction correctly states the applicable law. *State v. Blanton*, 2023-Ohio-89, ¶ 36 (2d Dist.).

### A. Instruction on Aggravated Menacing

{¶ 62} In his fifth assignment of error, Skirvin claims that the trial court erred in failing to instruct the jury on aggravating menacing for Counts 5 and 7. He argues that there was sufficient evidence to allow the jury to reasonably reject the greater offense of felonious assault on Sergeant Cairns and Detective Samples and to find him guilty of the inferior degree offense of aggravated menacing.

{¶ 63} A jury is permitted to find a defendant not guilty of an indicted offense but guilty of an inferior degree of the offense. Crim.R. 31(C); R.C. 2945.74; *State v. Beatty-Jones*, 2011-Ohio-3719, ¶ 20 (2d Dist.). "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph two of the syllabus.

{¶ 64} Courts employ a two-step analysis when determining whether an instruction on an inferior degree offense is warranted. *State v. Deanda*, 2013-Ohio-1722, ¶ 6 (employing a two-tiered analysis for a lesser included offense instruction); *State v. Shane*, 63 Ohio St.3d 630, 632 (1992) (test for whether to give an instruction on an inferior degree offense is the same as for a lesser included offense). The first step involves evaluating whether an offense is generally an inferior degree of the charged offense. The second step requires a review of the evidence in the case and a determination of whether the defendant could be acquitted of the charged offense but found guilty of the inferior degree of the offense. *Deanda* at ¶ 6.

{¶ 65} The Ohio Supreme Court has advised that an instruction on an inferior degree offense is not required every time the defendant has presented "some evidence" to support the inferior charge. *Shane* at 632-633. An instruction is "required only where the evidence presented at trial would *reasonably* support both an acquittal on the crime charged and a conviction upon the lesser included offense." (Emphasis added.) *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus; *State v. Smith*, 2002-Ohio-6659, ¶ 21.

{¶ 66} Felonious assault in violation of R.C. 2903.11(A)(2) occurs when a person knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance. *See State v. Creamer*, 2025-Ohio-5430, ¶ 29 (2d Dist.). In contrast, a person commits aggravated menacing when he or she "knowingly cause[s] another to believe that the offender will cause serious physical harm to the person or property of the other person." R.C. 2903.21.

{¶ 67} Several of our sister districts have held that aggravated menacing is an inferior offense of felonious assault. *E.g.*, *State v. Fant*, 2016-Ohio-7429 (7th Dist.); *State v. Guddy*, 2002-Ohio-3102, ¶ 15 (8th Dist.). These districts have considered the defendant's intent to merely scare or threaten the victim to be a mitigating element. *E.g., State v. Lodico*, 2006-Ohio-5714, ¶ 33 (5th Dist.). The parties have not directed us to dispositive case law from this district, and we have found none. *But see State v. Wilson*, 2022-Ohio-3763, ¶ 86 (Donovan, J., dissenting) (suggesting that aggravated menacing is an inferior degree offense of felonious assault), *rev'd,* 2024-Ohio-776; *State v. Carlisle*, 1994 WL 645989, *4 (2d Dist. Nov. 16, 1994) (reviewing whether the evidence supported an instruction on the "lesser offense" of aggravated menacing).

{¶ 68} During the charge conference, the prosecutor agreed with Skirvin that aggravated menacing can be an inferior degree offense of felonious assault. Trial Tr. 541.

Consequently, the State has waived any argument that aggravated menacing is not an inferior degree offense. We therefore decline to consider the State's argument on appeal that aggravated menacing is not an inferior degree offense of felonious assault.

{¶ 69} In denying Skirvin's request for an aggravated menacing instruction on Counts 5 and 7, the trial court referred to *Carlisle*, *Fant*, and *State v. Easley*, 2008-Ohio-468 (10th Dist.). In *Carlisle*, the defendant pressed a gun against the victim's chest as the victim was seated in the driver's seat of his car, then shot the victim and fired at his passenger. We held that the defendant was not entitled to a jury instruction on involuntary manslaughter based on aggravated menacing, as opposed to involuntary manslaughter based on felonious assault, when the defendant actually shot the victim, there was no evidence that he had fired the gun accidentally, and he "appear[ed] to have acted with utter disregard for human life." *Carlisle* at *4.

{¶ 70} The defendant in *Fant* was convicted of felonious assault based on evidence that he had leaned his head and arms out of the passenger window of a vehicle and then aimed and fired at the victim, who was driving in the car behind him. The Seventh District concluded that the evidence did not support an instruction on aggravated menacing. *Fant* at ¶ 52.

{¶ 71} In *Easley*, the State's evidence established that the defendant was visiting with several people in an apartment when he picked up a gun from the floor. Although warned that it had no safety, Easley pointed the gun at one person's face and fired. He then pointed it at a second person and pulled the trigger, but the gun jammed and did not fire. The defendant testified that he was trying to hand the gun back to the first person and it fired accidentally. He denied aiming the gun at anyone or intending to shoot anyone. On review, the Tenth District concluded that the State's witnesses established that Easley had

22

committed felonious assault and that Easley's version of events was inconsistent with any instruction on aggravated menacing. *Easley* at ¶ 66.

{¶ 72} Although not cited by the trial court, the defendant in *State v. Anderson*, 2021-Ohio-2316 (5th Dist.), was convicted of numerous counts of felonious assault after shooting at a car containing his girlfriend's former boyfriend and others. The Fifth District concluded that the trial court did not abuse its discretion in denying an instruction on aggravated menacing as an inferior degree offense of felonious assault, even though the defendant had testified that he had aimed his firearm above the car as a warning shot, rather than at a car. The court emphasized that Anderson's own testimony established he had shot in the same direction as the car and had chambered a bullet while standing in the intersection prior to aiming and shooting the weapon. The victims had testified that there was no bullet hole in the car prior to the shooting, and an eyewitness saw Anderson aim at the car. In addition, the ex-boyfriend testified that Anderson threatened him when he initially pulled out the gun and that Anderson later threatened to blow his head off. *Anderson* at ¶ 27.

{¶ 73} The trial court denied Skirvin's request for an aggravated menacing instruction, focusing on his testimony that he saw the officers' vehicles but did not see the officers themselves. It concluded that if Skirvin did not see anyone to harm, an aggravated menacing instruction would be inconsistent with the evidence. Defense counsel responded that Skirvin saw the Stop Sticks and knew the officers were there. The trial court noted defense counsel's argument but did not change its ruling. The State reiterated its position that the facts supported an instruction on felonious assault only.

{¶ 74} We disagree with the trial court that an aggravated menacing instruction was inappropriate simply because Skirvin testified that he did not see Sergeant Cairns and Detective Samples. Skirvin said that he had seen a marked Dayton police cruiser and Stop

23

Sticks as he approached their location. When asked what made him fire his weapon, Skirvin responded, "If there's a police cruiser, there's a police officer." Trial Tr. 516. Moreover, mere moments before Skirvin fired his shotgun, Samples threw his Stop Sticks in front of the pickup, pinpointing his location. The evidence supported a reasonable conclusion that Skirvin knew of the officers' presence when he fired his weapon.

{¶ 75} Nevertheless, we conclude the trial court did not abuse its discretion in rejecting an aggravated menacing instruction for Counts 5 and 7. Beginning with Skirvin's assault on his daughter, Skirvin's conduct on January 8, 2024, displayed little concern for human life. From the start of the pursuit, Skirvin acted recklessly, driving at excessive speeds, using the oncoming lane, and swerving around traffic; he continuously held a loaded shotgun out of the driver's window until after he had shot the weapon and was fired upon. Both Cairns and Samples testified that Skirvin's shotgun was aimed at them as he passed them eastbound. Samples clarified that the gun was not pointed toward the sky or at the ground. Still photographs taken from Cairns's cruiser video showed the position of Skirvin's shotgun after he passed by Samples. State's Exs. 11, 12. Skirvin acknowledged that he shot in the officers' general direction. Although Skirvin testified that he did not aim at the officers and that his intent was to escalate the situation, not to cause physical harm, we conclude that the jury could not have reasonably acquitted Skirvin of felonious assault yet convicted him of aggravated menacing.

{¶ 76} Skirvin's fifth assignment of error is overruled.

**B. "Blackout" Instruction**

{¶ 77} In his second assignment of error, Skirvin claims that the trial court committed plain error by failing to provide, sua sponte, a blackout instruction on Count 3 (felonious assault on Officer Richardson).

24

{¶ 78} The blackout defense applies when a person commits an act while unconscious (blacked out) due to disease, injury, sleep, or heart failure. *Ireland*, 2018-Ohio-4494; *State v. Blanton*, 2023-Ohio-89, ¶ 38 (2d Dist.). The defense is not available in every instance where the defendant cannot remember what occurred. *E.g.*, *State v. Griffin*, 1988 WL 4651, *2 (10th Dist. Jan. 19, 1988); *State v. Cutlip*, 2001 WL 687493, *7 (11th Dist. June 15, 2001). Rather, it is available only in those instances where unconsciousness prevented the defendant from acting normally. *Griffin* at *2; *see Blanton* at ¶ 41. "This would include such a situation as operation of a motor vehicle, where blackout would be a defense for losing control of the vehicle and causing injury or death to another." *Griffin* at *2.

{¶ 79} Skirvin did not request a blackout instruction, and he did not object to the trial court's jury instructions. Consequently, Skirvin has forfeited all but plain error. To constitute plain error, the error must be an obvious defect in the trial proceedings and must have affected Skirvin's substantial rights. *State v. Norris*, 2015-Ohio-624, ¶ 22 (2d Dist.); Crim.R. 52(B). Plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus.

{¶ 80} On this record, we cannot conclude that the trial court's failure to provide a blackout instruction sua sponte affected Skirvin's substantial rights. The court properly instructed the jury that the State had to prove that Skirvin had acted knowingly to commit felonious assault. The court properly defined "knowingly" for the jury. As a result, the jury was informed that, to be convicted, Skirvin had to have been aware that his conduct would probably cause a certain result or would probably be of a certain nature. *See*

25

R.C. 2901.22(B). Skirvin could not have acted knowingly if he were unconscious. Thus, viewing the jury instructions as a whole, the instructions sufficiently informed the jury that it must find him not guilty if it concluded that Skirvin was unconscious when he veered toward and collided with Officer Richardson's cruiser.

{¶ 81} At trial, Skirvin testified that he was losing consciousness after being shot by Sergeant Cairns and Detective Samples, and he said that he did not recall the crash or throwing his rifle out of the window; he argued that he had blacked out prior to the collision. In contrast, the State presented evidence that Skirvin was driving normally until he veered across the Liscum intersection toward the cruisers. The evidence further showed that after crashing into the cruisers, he threw his rifle out the window of his truck. The State's evidence, if believed, demonstrated that Skirvin was conscious when the crash occurred and that he had knowingly and voluntarily veered across the Liscum intersection to strike the cruisers parked there. We cannot say that the absence of a blackout instruction was an obvious defect in the proceedings or that the outcome of the trial would have been different had the jury received that instruction.

{¶ 82} Skirvin's second assignment of error is overruled.

### IV. Conclusion

{¶ 83} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.

26